Good morning, everybody. So our first case is United States v. Banks. Ms. Horn, good to see you. May it please the Court, my name is Abigail Horn and I represent the appellant Fred Banks. May I please reserve three minutes for rebuttal? Absolutely. Thank you. Your Honors, this case raises two primary issues. First, Mr. Banks was denied his Sixth Amendment right to self-representation. And second, the intended loss commentary to the fraud guideline, 2B1.1, violates the landmark decisions in Kisor and Nasir. I'd like to begin with the trial claim before moving on to intended loss, which is, of course, an important issue of first impression. Mr. Banks was denied his right to self-representation. The district court, while diligent, viewed the entire record through the wrong lens. In particular, the court conflated two distinct inquiries, whether Mr. Banks could waive counsel, the Peppers inquiry, and whether he was competent for self-representation, the Edwards inquiry. To be clear, there is a bright line rule in operation here. At Pepper step two, a court cannot consider competence for self-representation when evaluating a waiver. The Supreme Court said this in Godinez versus Moran and Edwards, and this court said the same thing in Peppers. Did the court question the defendant and assured itself that he was not competent to represent himself? The court did question the defendant. It's our position that all of Mr. Banks's answers to the Peppers inquiry established that he could waive counsel. He understood the charges, the potential penalties. He believed he had defenses to the elements, and he understood the risks of self-representation. Is the district court permitted to take into account what the trial might look like in that analysis? What the district court must do is consider two things separately. First, it must consider the waiver, and to do that, it's exactly what the Peppers colloquy requires. Mr. Banks has to be making a knowing, intelligent, and voluntary choice, and that inquiry is not about what the trial might look like. What FERRETA stands for is autonomy. In this country, if someone wants to go in and argue that they're a sovereign citizen and the UCC code makes them not guilty of the offense, they're allowed to crash and burn in that fashion under FERRETA. I was just going to say, the court, in fact, I would say retained or used three separate experts to help the court determine whether Mr. Banks could, in fact, represent himself, and on the basis of that assessment, the court determined that he could not. Your Honor, the court did do three assessments, and I think it's important to remember that the court overruled the doctor in this case. The final assessment by Dr. Marquez, the expert from the Bureau of Prisons at Butner, after Mr. Banks was restored to competency, said that he was an expert who had evaluated Mr. Banks before he was restored to competency. It is ultimately for the court to decide, isn't it? It is for the court to decide, but we cannot have the court decide on the wrong test. Was it appropriate for the court to consider Mr. Banks' long history of litigation and of litigation that had been found to be baseless and, I believe, of filing documents presenting his position that, in fact, was not a legal position or one that was recognized as valid by the court? Was it appropriate for the court to consider that history? Mr. Banks certainly has a history of litigation, and there are many filings in this case. If anything, what frivolous filings at a certain level could potentially go to Judge Roth is whether the right to counsel should be revoked for serious obstructionist misconduct, but that's not what the court said here. That's Feretta Note 46. In that case, you give somebody a chance, you warn them, you must follow the rules. If you do not, if you continue with this course of frivolous filings, then your right to self-representation will be revoked. There's no – Didn't he – I mean, Judge Hornak, or Chief Judge Hornak, in his, I guess, second opinion, supplemental memorandum, lists quite a few filings that he found troubling. And I think part of his decision to not allow self-representation was based on these filings. Was that inappropriate of the judge to do that? Your Honor, I think what that question goes to is more than the quantity of the filings, it's the content. Judge Hornak believed that some of the filings, in particular ones that referred to CIA harassment, this concept of voice-to-skull harassment, rendered Mr. Banks unable to represent himself. The problem here is that it's really unclear whether the court was referring here to Peppers, whether the court was referring here to Edwards. And remember, Mr. Banks has done this before. He represented himself in a federal jury trial in the past. He represented himself at a violation of supervised release on these exact same facts at a time when he professed a belief in voice-to-skull technology. And both times this court affirmed the decision to allow him to represent himself. Mr. Banks had his eyes wide open when he said he wanted to conduct this trial on his own. And what would have been most protective of autonomy would be to allow him to do that. In the Edwards inquiry, there's a somewhat paternalistic notion that some defendants are so far out there that we must protect them from themselves. Mr. Edwards was schizophrenic. He couldn't string a sentence together. He was incomprehensible. And in that case, the Faretta right gave way. That's not so with Mr. Banks. But is there not only protecting the defendant from himself, but protecting the court from being made a circus of? Does not the judge have the ability to determine that a particular individual may not have the reason or self-discipline to abide by the rules of the court? And in opposition to those rules, will attempt to what appears to be make chaos of the court proceeding? There is such a notion, Judge Roth. But again, this isn't the Edwards inquiry or the Peppers inquiry. This is Faretta note 46, revoking for obstructionist misconduct. Mr. Banks ought to have been given a chance to try with instructions, with standby counsel who could tap him and say, no, no, you can't do that right now. The whole point of standby counsel is to help somebody follow the rules of decorum. Mr. Banks can control himself if he so chooses. The docket of this court is a prime example. If the court has observed, there's not one pro se filing by Mr. Banks in the docket of this particular appeal. And so Mr. Banks ought to have been given the opportunity to make that choice and to represent himself. Again, Judge Hornak cited memorandums about the Bernie Madoff case. Notice to Robert Mueller, the shooting by Nicholas Cruz. Things that in no way could be relevant to this case. I mean, was that his opportunity? Was it Mr. Banks' opportunity to file relevant motions and he didn't? And so Judge Hornak says, we're going to end this here? I think the problem here, again, Judge Restrepo, goes back to the court's test. That the court is doing a mix of Peppers and Edwards, saying Mr. Banks doesn't understand what's possible in the criminal justice system. Instead of, if this is an obstructionist misconduct case, treating it that way. You're most eager about loss. Yes. Thank you. The intended loss commentary to the fraud guideline 2P1.1 violates the landmark decisions in Kisor and Nasir. Under those important decisions, commentary can only interpret the guidelines text. It can't expand it. And what that means is this court can, at this point, not defer to guidelines commentary. Unless, one, the text is genuinely ambiguous after applying all the rules of statutory interpretation. And, two, the commentary is a reasonable interpretation. That is, it falls within the zone of ambiguity identified at step one. The intended loss commentary falls at both steps. At Nasir step one, the text is not genuinely ambiguous. Loss means actual loss. The government stresses that there's no definition in the guidelines text. But, of course, that's very common, and the court simply turns to ordinary meaning. When we look at every dictionary definition, they all have one thing in common. They refer to actual loss. The government has identified no definition of loss to mean intended loss. And that's fully consistent with normal usage. In ordinary English, we use loss to refer to actual loss. In the briefs, we gave the example of the Osang case, where a fraudster says, I'm going to sell you fake money cleaner for $100,000, and makes this pitch to a government informant. Of course, he receives nothing. We don't say of these facts, the loss was $100,000. The same thing for a fraudulent millionaire who asked to withdraw a million dollars from the bank, and, of course, gets nothing. We don't say the loss was a million dollars in ordinary English. So, if I understand your argument correctly, because there was no actual loss here, there was no monetary loss, it's zero. Yes. But isn't the penalty ultimately imposed based on the amount of the loss? You wouldn't say the penalty is zero. The penalty imposed is the amount of the loss, and the loss means the actual loss. There is no loss in this case. Yes. What if there is no loss? Right. Then, under the text of the guidelines, there can be no enhancement. Now, of course, Congress can make a policy choice that they believe people should be punished for intended loss, but that would have to be in the text of the guideline itself. It can't be in the commentary under NASIR. You use the word enhancement, but the individual can be punished based on what he attempted to do. Well, Judge Fuentes, that's exactly the problem in NASIR. It didn't say attempt when describing a controlled substance offense. That was only in the commentary. And so, when the defendant attempted to commit a drug offense, he couldn't be punished for that because the court wasn't allowed to refer to the commentary under CAIS or NASIR. And the same applies here. Congress could fix this if it chose to do so by putting intended loss in the text of the guideline, or the judge, absent that, could use the mechanism of a variance in the meantime. But what the court cannot do is rely on the commentary because the commentary is not interpreting the guideline. It's making a policy choice that someone should be punished for the losses they intend. So, if you were writing this opinion, you would say, Judge, your remedy here is to do a variance consistent with the fraud guidelines, if you so choose, but you can't refer to the commentary to support the adjustment. Yes. What the government is actually asking the court to do here is to read the word intended into the text of the guideline. The court made this observation recently in Kirshner when it said that only the commentary and not the text of the guideline refers to losses that are merely intended. And, of course, you can't read a word into the text of the guideline. That's not permissible under statutory interpretation. Is there any question that he wanted a lot more than he got? In other words, his intent was for a lot more money in the Internet transactions than he actually received? He received nothing. We're not here arguing that the intended loss commentary is not satisfied. We're arguing that the court cannot defer to the intended loss commentary under Kisor and Nasir. If I could just give another example, when this court decided the FDCPA en banc decision recently in Riccio, the question there was whether you could read a word into the text. And the court said, No, we cannot do this. Even if we think Congress inadvertently omitted the word, even if there's a harsh result, even if there's an incoherent result, it's up to Congress to fix it. There's a role issue here. And when the court does statutory interpretation, it's not the court's role to add a word to the text. You know, when I was a district judge 30 years ago, I had a number of cases where both pre-guidelines and with the guidelines, the intended loss was argued strongly by the government as a consideration to make in sentencing and, in fact, was something I did consider in sentencing. So this is a problem that's been going on for years and years and years. Are you the first one to come forward and really argue it as an important consideration that district judges should have? Well, Your Honor, the reason why this is a novel issue is because Kisor radically changed our deference. As Judge Bibas said in his concurrence, the court had a reflexive slumber in which the court automatically deferred to the guidelines commentary. That's how we did it since the times that Your Honor was referring to. But Kisor changed that entirely. Under that, our deference and, therefore, the deference that we give to guidelines commentary has been significantly narrowed. No longer can it expand on the text. It can only do interpretation, and it can only do interpretation if the text is genuinely ambiguous, which Judge Kagan reminded us in Kisor is something that a text can fail. We're not to automatically, in a knee-jerk fashion, defer to commentary. Under Kisor and Nasir, we're to conduct this very strict two-part test to make sure that there is ambiguity, and that the interpretation is within the zone of ambiguity. As to the latter part of that, this is how the Sixth Circuit resolved the issue in Ricardi. They said, okay, maybe there is a zone of ambiguity around the meaning of loss. It could mean the face value. It could mean the replacement cost. There's some questions here. But even if there is a zone of ambiguity, $500 per gift card is not within the zone. And the same is so here. Even if there is some ambiguity about the meaning of loss at Nasir Step 1, at Nasir Step 2, intended loss is not within that zone of ambiguity. In no place in ordinary meaning do we refer to loss to mean a loss that someone subjectively intended but was impossible. That's just not what the word means. And so when we refer to the punishment for intended loss, that's a policy choice that Congress has to make in the guidelines text itself. What would be the correct punishment if the individual intended a loss of $200,000, but it didn't turn out that way, did not get to $200,000, in fact, got zero? What would be the appropriate punishment? Well, Judge Fuentes, I think this is a really important policy question, which underscores why it should be for Congress to make and not the commission. But what do we do with this case? In this case, the court has to say that the intended loss commentary fails under Kisor, under Nasir, as this court observed in Kirchner, and tell the judge that you can vary if you so choose. Can do what? Could vary if he so chooses. Vary it? Yes. Vary it to zero, perhaps? He could, he must calculate the guidelines correctly, and then he could impose a variance if he so choose. Don't we get to the same place? So let's assume Judge Hornak, we send this back to Judge Hornak and say, you can't consider that application note. But then he could take a look at the table and say, I'm going to vary consistent with the intended loss. Would that be appropriate? We would then be debating whether a variance was appropriate. But that's not uncommon. When this court grants relief on guidelines issues, often the court goes on to say, we're not forecasting what's going to happen on remand. You know, the district court has the power to issue a variance, the guidelines are advisory. That's a very common outcome in guidelines claim. So the judge could still look at the same table and come up with the same sentence, but just call it a variance as opposed to an enhancement. And I'm sure we'd be in front of the district court arguing against that, but I'm sure the government would be arguing for that result. Or not. Or you would argue very ably either way. Thank you, Judge Roth. But there is a question here, which is why it's a question for Congress. If somebody pockets a million dollars from actual victims, are they really as culpable as somebody who has a deluded plan to pocket a million dollars and gets nothing? Maybe there's a difference in culpability there that should be reflected in the sentence. And that's the decision that Congress must make. Thank you. Ms. Irwin, I hope you've heard everything and you can hear us all right. At one point I couldn't hear Judge Roth. I didn't know what to do about that, so I just waited for it to come back. If you can't hear us, do let us know. You can raise your hand or just let us know you can't hear us. Okay. Laura Irwin from the U.S. Attorney's Office on behalf of the United States. In this case, the district court did not deny Mr. Banks his Sixth Amendment rights. When Mr. Banks asked to be here pro se, there's a fundamental difference in approach to this issue between the parties. Our approach begins with the court's decision at 874 in the record. If the court looks at that, you'll understand that what the court was doing was looking at mental competency. And to understand what the court was doing, it's important to understand the intersection between Peppers and Indiana v. Peppers. If you look at page 132, this court set forth three things that a court must do when a defendant asks to appear pro se to waive his Sixth Amendment rights. The first one is to assert his desire clearly. The second is a waiver that's knowing and voluntary. And the third is that he must be competent to waive. And if you look at footnote 11 in Peppers, you'll see that the mental competency of Mr. Peppers was not an issue in that case. So when you look at Peppers, they're talking about the competency as a lawyer with regard to the knowing and voluntary analysis. When you look at the Edwards case, you see that the question there was mental competency. The court was faced with a defendant who the court had already determined was competent to stand trial. And the question was, is he competent to waive his right under the Sixth Amendment? And that's the analysis the court undertook by looking at the various factors the Supreme Court has already established to basically go to competency. What is the capability of the defendant to understand what is going on? So it's a mental competency issue. And that's really the answer to Peppers step three. Is the defendant mentally competent to make this waiver? So when you look at the court's decision, if you move up to page 887, by that point, the court on the previous page has concluded that Mr. Banks is competent to stand trial. The next question is at the top of page 887, the question of competency to waive the right to counsel. The court goes on to mention and cite Edwards, and then the court goes on to analyze everything it's heard and seen about Mr. Banks. It undertakes an extremely intensive analysis, looks at how much time the court spent with Mr. Banks and got to know him, talks about all the events in the case, things that have gone on, what the witnesses with regard to competency had to say, and concludes that Mr. Banks lacks the mental capacity to understand the waiver of his Sixth Amendment rights. There was a, there was, wasn't there a contrary finding? A Dr. Westing found that in fact, he was competent to stand trial and competent to represent himself. And that's what he wanted. That's what, what he wanted to do. He wanted to be competent to stand trial and he wanted to be competent to waive. But what Mr. Banks is challenging on appeal to me seems to be a claim that the court denied his rights under Peppers by combining Peppers and Indiana, v. Edwards. And it's true, those two have to combine, but it's for the question of mental competency. And that's, there's been no argument that the actual finding of competency was incorrect. He keeps saying that the court reached it by considering his technical competency under Peppers. That's not what Judge Funak did. If you look at these pages, the court goes on to talk about competency in light of Indiana v. Edwards. Later does mention Peppers because of course this is Peppers step three. And he is always talking about capacity to understand, capability, not his ability as a lawyer, but his ability from a mental health perspective to comprehend what's going on, to communicate with his lawyer. If you look at the words chosen by the court throughout this opinion, the court concludes he has no competence to make the decision to give up his right to be represented by a lawyer in related proceedings in a knowing way. That's a mental competency determination. Mr. Banks is just like the defendant in Indiana v. Edwards. That defendant was deemed competent to stand trial. And the question the Supreme Court faced was, how do we decide? What tests should be applied? Can a court make a defendant have counsel when he is trying to waive and has mental health issues? So there are two distinct analyses, and Banks is asking the court to push them together and say that every time the word competency is used, it has to mean competency under step two of Peppers. And that's not what happened here. The court was not addressing whether or not Mr. Banks had mental health issues under step two of Peppers. Instead, he was simply looking at mental competency. Thank you. Let me ask you about this loss issue. So Ms. Horne makes a very compelling argument that under Nassir, given that the guideline says loss, we don't go to the notes. Why is she wrong? Well, for a number of reasons, Your Honor. First and just briefly, the issue is not preserved. We're on a plain error review, and I'm happy to go into greater detail on that if you'd like. But jumping into the meat of it, Nassir and Perez have told us that the first thing you do, as Ms. Horne said, is you have to determine whether or not the term is ambiguous. And you can't just look at the text. In the briefing, Mr. Banks just wants to look at the text. But if you look at the history and the purpose and the structure of the guideline, you'll see that the term is, in fact, ambiguous. Congress is the one that said, you know, TV 1.1 was approved by Congress, and Congress said, we are going to monetize loss for purposes of sentencing. And the commentary does not add anything new. They provide the definitions. So the purpose of this guideline, as instructed by Congress, we're going to monetize loss. Obviously, there's going to be a lot of ways loss can be defined. You know, I lost my spouse, I lost my dog, I lost money. It's not just actual loss. And so if you look at all those things, and the Sentencing Reform Act told, you know, the commission, look at the harm caused. And so when Congress monetized loss, they said this is how we're going to assess culpability for this part of the sentencing analysis. And so our position is that it is ambiguous. So you go to step two, which asks, is it a reasonable interpretation? Is commentary, number two, a reasonable statement? And our position is, of course it is. And we know from Perez that you can look at other commentary, you can look at case law to determine if it's reasonable. And we believe that in this case, that's exactly what happens here, because we know from the other commentary that acting upon Congress' directive that it's going to be a monetized loss, we know that it's only pecuniary. We are not going to include non-economic crimes. We know it's going to be intended loss. That's exactly what the commentary says. And we know that it's intended loss, and how specific intended loss must be from the bookend cases that Perez talks about that tell us what intended loss means. We know from Perez and I think Kushner talks about the important deep dive that must be taken to force the government to connect the intent to every dollar that we want to attribute to that defendant. May I ask you a question, just to see if I follow you? There is, of course, a difference between the intended loss, which I understand in this case to be in the area of $200,000, and actual loss, which I understand to be zero. Am I accurate about that? So what should our focus be in terms of, let's say, for example, sentencing? There's a big difference between what he tried to do and what he actually got done. That's true, but a couple things. Let's bear in mind that he could have been found guilty by a jury if the loss, if we had said it was zero loss at that time. Because the intent under the statute, it doesn't matter whether the outcome even happened or was possible, right? The jury had to believe he was guilty that he intended to cause that loss, regardless of whether it ever happened, right? Yes, but let's say for sentencing purposes, there's got to be a significant difference between what he tried to do and what he actually got away with. Well, my question would be, why does that have to be the case if he was found guilty of perhaps not actually getting any money? If we can hold someone guilty beyond a reasonable doubt, I'm not sure why the sentence shouldn't reflect as much. Congress has told us they want a monetized loss. They've given us a reasonable interpretation. And the only way that the government can actually get that dollar amount, we know from the case law from Perez and Kirshner, is there has to be a deep dive by the government to show that the defendant intended each of those losses. So if the defendant did not actually intend those losses, then he's not going to be held responsible. So how do you reconcile your position with Nasir? Well, because Nasir, to us, is a completely different situation, to the extent that the guideline in Nasir said one thing, and the commentary added a whole new body of things. It wasn't a definition. It was a change in substantive law. And this is completely different because we have Congress telling us we're going to monetize loss, and commission, you can tell us exactly how to do that. But unless it's monetized, it doesn't get attributed to the defendant. That's how we would distinguish the two of them. You're looking puzzled. You seem to have another question. No. I think I follow you. So the term loss to you has always the same meaning. It's not susceptible to variations. It always means... It is very... Excuse me. I didn't mean to talk over you, Your Honor. To us, it is very susceptible to different meanings. In fact, the Sixth Circuit found as much in the McCarty case when they talked about, you know, it means different things in many contexts. Let me ask you this. If somebody goes into a bank to rob a bank and gets away with $200,000, or goes into a bank and the teller, let's say, gives them a bag full of nothing, do you not think that the sentence should be somewhat different based on what this bank robber got away with? Well, that would be a basis for a variance. If the government was unable to prove the defendant's intent to take a certain amount of money... Maybe now we're getting somewhere. But you don't think a variance would apply in this particular case? I do think it would apply if the government failed to show... I'm sorry. To be clear, if we could show the intent necessary to get an add-on under 2B1.1 and it's sentencing, the defendant is free to make the argument that that overstates the seriousness of his offense. That's a separate issue than whether or not he's accountable for it under the guidelines. Okay. That makes a little bit more sense from my perspective. Does the court have any other questions on this issue? Jan, do you have any other questions? No, I don't. I don't. Thank you. No, we don't. Thank you very much. Thank you. With that, I would ask the court to affirm. And thank you for allowing me to appear by video. How are you feeling? I'm getting there. Good. Thanks for being with us. Thank you. Ms. Warren? Thank you. I'll try to tick through here. First, the government pays lip service to the notions of history, purpose, and structure, but there's no substance to the argument there. They offer nothing beyond saying those words. The government also refers to examples of loss. I lost my spouse. I lost my dog. I lost my money. All of those, again, are actual loss. This is exactly how we use the word loss in ordinary English, to refer to actual loss, not intended loss. The government says that the commentary is reasonable. How about I lost my cool? I actually lost it. I didn't intend to lose it. Usually we don't intend to lose it. The government says the commentary is a reasonable interpretation. What we mean here by reasonable is important. Not that it's reasonable to punish somebody when they intend to harm. Whether it's a reasonable interpretation of the words in the guideline. That's what Nassir means. What do you make of her distinction of Nassir? I don't find it compelling, Your Honor. The government says the guideline text monetizes loss, so we know we're in the world of dollars, and this is a quote, commission, you can tell us how to do that. Nassir says, no, the commission can't tell us how to do that. That's the whole point of Kaiser. This isn't the role for the agency. Only the guideline text goes through notice and comment. Only the guideline text goes to Congress. Congress has to make the decision whether you get plus 12 for having a deluded, impossible plan to steal a million dollars, or whether you get plus 12 for actually stealing a million dollars. I want to very quickly also just say that this issue is preserved. This is not a case where Mr. Banks didn't challenge the plus 12. He absolutely did. At Appendix 1816, he said, judge, don't apply the plus 12 loss enhancement. There was no actual loss in this case. That's exactly what we're doing here. Under Rule 51, you can preserve an issue by telling the court the action you want it to take. Mr. Banks said, the action I want you to take is don't give me the plus 12. So that absolutely did preserve the issue. It's irrelevant because we would win under any standard of review. Also, I would point the court to the cases in our reply brief at page 20, citing five separate circuits that say, objecting to a guideline enhancement as Mr. Banks did here is sufficient to preserve the issue. But what is your take on how we should define the term loss in this particular case? It should be defined as actual loss, Judge Fuentes, not intended loss. And what amount is that? Zero. So no penalty. Under the guideline calculation, the plus 12 enhancement would not apply. Then, as the court has the right to do under Booker, it could choose to impose a sentence within the guideline range, below the guideline range, above the guideline range. What is the guideline range in this case? I apologize, Judge Fuentes. I don't have that at my fingertips. So what you're saying is the remedy the court would have if we agreed with you would be to vary consistent with whatever the court thought was appropriate. Absolutely. The government has its Booker discretion. That's what I thought. Thank you. Thank you. Thank you, Ms. Warren. Thank you, counsel. Thank you very much for being with us and for your excellent briefing. We will take this case under review.